IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DENNIS WHALON,                        )
                                      )
            Plaintiff,                )   Case No. CV05-1481-HU
                                      )
      vs.                             )
                                      )   OPINION AND ORDER
EXPRESS.NET AIRLINES LLC, a           )
corporation,                          )
                                      )
            Defendant.                )
_____  )

Russell J. Thomas
Thomas & Associates
2532 Dupont Drive
Irvine, California 92612

David J. Hollander
Hollander, Lebenbaum, & Gannicott
1500 S.W. First Avenue, Suite 700
Portland, Oregon 97201

      Attorneys for plaintiff

///


1   - OPINION AND ORDER

Amy R. Alpern
Amburgey & Rubin
1750 S.W. Harbor Way, Suite 450
Portland, Oregon 97201

    Attorney for defendants

HUBEL, Magistrate Judge:

    Plaintiff Dennis Whalon was employed as a pilot at defendant Express.Net from 2000 to February 2005, when Whalon resigned. Express.Net is in the air cargo carrier business and is headquartered in Naples, Florida.

    Whalon brings this action against Express.Net alleging that he refused to fly an airplane he believed was mechanically unsafe and that he made an anonymous call to an FAA hotline to report the mechanical problems. First Amended Complaint ¶¶ 18, 20. Whalon alleges further that "a few days later," Express.Net changed Whalon's flight schedules, and that Joe Huertas, Express.Net's Assistant Director of Operations and Director of Training, called Whalon and told him to resign his FAA Check Pilot authorization or else Huertas would revoke it. Id. at ¶ 23. Thereafter, Huertas revoked Whalon's FAA Check Pilot authorization and "drastically cut" his monthly salary. Id. at ¶¶ 24, 25. Whalon alleges that Express.Net's acts and conduct toward him were so intolerable that he was left with no choice but to resign, which he did on or about February 28, 2005. Id. at ¶¶
///

2  - OPINION AND ORDER

26, 27. Whalon asserts three claims for relief; Express.Net moves
for summary judgment on all claims.

**Factual Background**

In January 2003, Whalon was given Check Airman status. A
Check Airman is a pilot designated by the FAA to ensure that the
competence of all crew members remains at the required level.
Check Airmen are required to be knowledgeable about FAA
regulations and safe operating procedures. They also help train
crew members. When a pilot is recommended for the position of
Check Airman, the FAA sends a letter conferring that status. As
a Check Airman, Whalon was guaranteed a monthly salary of $900
per month and was paid $15 per hour, in addition to his pay as a
Captain, for every hour over 60 per month that he worked.

On September 24, 2004, Captain John Wood and Flight
Engineer John Casey approached Whalon and Flight Engineer John
Waters in Dayton, Ohio. Wood advised Whalon that aircraft N370PC
had experienced an engine over-temp on the flight from Charlotte,
North Carolina to Dayton. Wood had recorded the engine over-temp
on the aircraft in the aircraft log book, in accordance with
company policy. Whalon asserts that Casey or Wood told him the
aircraft had prior over-temps that had not been logged.

Whalon thought he might be scheduled to fly aircraft N370PC
from Dayton to Toronto on September 24, 2004. Whalon believed it
would be unsafe to fly N370PC, and told Express.Net's chief

pilot, Kittridge, that he would not fly the plane. Whalon learned by 7:00 a.m. on September 24 that he was not scheduled to fly N370PC that day.

After learning he was not going to fly from Dayton to Toronto, Whalon remained in Dayton to await his next assignment. Stuart Coots, Director of Maintenance for Express.Net, arranged for a crew to perform an engine run-up on N370PC on September 24 or 25, 2004. Whalon and Waters were present at the airport during the engine run-up, during which the engines over-temped. Coots testified at his deposition that after he reported the over-temp to Express.Net, it was decided to change a fuel control unit. Coots dep. 16:22-24.

On September 26, 2004, Whalon spoke to a member of the crew assigned to fly N370PC from Dayton to Toronto. Whalon does not recall who the crew member was, but the crew member told him the mechanic in Dayton had borescoped one engine but "not the worst one," and that the crew member was afraid to fly that aircraft to Toronto. Whalon has no personal knowledge of what maintenance, if any, was performed on N370PC after the engine run-up and before its departure from Dayton. The Chief Pilot, Kittridge, flew the plane to Toronto.

On September 26, 2004, Whalon called the FAA's anonymous hotline number and reported that aircraft N370PC had experienced over-temps in both engines, and had not had proper inspection and

maintenance. On November 18, 2004, the FAA issued a formal response to Whalon's complaint which exonerated Express.Net.

Whalon told Captain John Paul, the president of his union, about his call to the FAA hotline. Whalon told Paul not to tell anyone he was the hotline caller, and Whalon believes Paul kept the communication confidential. Whalon did not tell anyone else at Express.Net that he was the caller, but Whalon has testified that he believes James Young, who was at that time president of Express.Net, and Joe Huertas figured out that he had made the call. Young has testified that sometime in October 2004, he and Ray Barkoot, who was at that time Director of Quality Control and Chief Inspector at Express.Net, had a conversation about Whalon being the hotline caller. Affidavit of Amy R. Alpern, Exhibit 1 (Deposition of James Young) 42:3-18 (hereinafter Young dep.) Later, Young was present at a conference call involving Barkoot, and Stuart Coots, Director of Maintenance, and another individual, Lorenzo Rodney, when Barkoot suggested the hotline caller was Whalon. Young dep. 44:6-25:6.

James Young was terminated by Express.Net in November 2006. On November 17, 2006, Young filed a lawsuit against Express.Net alleging, among other things, that he was terminated for bringing to the attention of Express.Net's principals violations of FAA aviation safety requirements. Affidavit of Russell J. Thomas, Exhibit D (Complaint filed in the Circuit Court of the 20th

5   - OPINION AND ORDER

Judicial Circuit, Collier County, Florida). Young has testified that Dave Clark, the owner of Express.Net, told Young that if he learned who had called the FAA hotline, he should fire that employee, and that Young agreed to do so. However, Young has testified that Express.Net did not, to his knowledge, attempt to fire Whalon at any point, and that he himself never attempted to fire him. Young dep. 35:15-19.

All crew members, including Captains, First Officers and Check Airmen, are required to complete and pass proficiency training involving a flight simulator. Affidavit of Wes Walker ¶ 2. The tasks completed during proficiency training are graded as either satisfactory or unsatisfactory. Id. Crew members, including Captains, First Officers and Check Airmen are also required to complete and pass simulator check rides, called proficiency checks. Id. at ¶ 3. The purpose of a proficiency check is to evaluate maneuvers required by the Approved Training Program and FAA regulations, while analyzing the crew member's ability to operate safely in a real time environment. Id. These maneuvers are also graded as satisfactory or unsatisfactory. Id.

On October 25, 2004, Wes Walker, who was a Line and Simulator Check Airman responsible for conducting training, conducted a proficiency training for Whalon. Id. at ¶ 3.

According to Walker, during the proficiency training, Whalon started his descent prematurely during a simulated

approach to Los Angeles International Airport, an error that is considered "extremely hazardous." Id. Walker then inserted into the program a Ground Proximity Warning System (GPWS) exercise. A GPWS exercise simulates a rising terrain that eventually will exceed the altitude of the aircraft, resulting in a simulated crash if no action is taken. Id. Simulator training attempts to create challenges that reflect real life situations, and when a pilot has lost situational awareness, the GPWS drill is a common exercise.

Walker states that despite all the warnings in effect alerting him to an impending crash, Whalon did not initiate any of the requisite escape procedures and the proficiency training session was stopped just before a simulated crash. Id. at ¶ 4. Walker graded the proficiency training as unsatisfactory, a grade with which Whalon agreed. Id.

Whalon was required to retake the proficiency training the following day. Id. at ¶ 5. On that day, Whalon performed at a satisfactory level. Id.

According to Whalon's affidavit, at his proficiency training on October 25, 2004, Walker told him that he, Walker, had received a call from Huertas in which Huertas told Walker he had just come out of a management meeting that concerned Whalon's employment with Express.Net. Whalon Affidavit ¶ 14. Whalon states that Walker said to him, "I would not want to be in your shoes

right now, Dennis," and that what Whalon did "pissed everyone off." Id. at ¶ 15, 16. At that time, according to Whalon, John Casey, another Check Airman who was present at the proficiency training, told Whalon he was "going to get everyone fired and that I should never have contacted the FAA." Id. at ¶ 17.

After Whalon failed the proficiency training on October 25, 2004, Huertas contacted Randy Kania, Director of Operations, and suggested that Express.Net ask Whalon to return his Check Airman letter. Kania Affidavit, ¶ 6. Whalon's Check Airman status was revoked in December 2004. As a consequence, Whalon lost the extra income he had received for being a Check Airman.

Young has testified that he had no direct knowledge or specific evidence that the training department had failed Whalon on purpose, but did have some "speculation," that Whalon's failure on the proficiency training test was related to his having called the FAA. Thomas Affidavit, Exhibit B (Young dep.) 31-32, *passim*. At the time of Whalon's proficiency training, Young was aware that Whalon was the person who had called the FAA hotline. Thomas Affidavit, Exhibit B (Young dep.) 31:23-32:1. Young testified that Barkoot also knew Whalon was the one who had called the FAA hotline. Id. at 41:17-23.

Young said the reason he thought Whalon's failure on the proficiency training had something to do with the FAA hotline call was because Whalon "had become very vocal towards Tom

8   - OPINION AND ORDER

Kittridge through the process of the engine and the hotline calls." Id. at 33:13-15. Young said,

> We had talked about it in meetings who the person was, and over time--over the history when I was at Express.net, if a crew member was marginal, the trainers could pass him and get him through. And if they liked him, they would probably give him that benefit of the doubt and work him through that process. Dennis's name was going around quite frequently, and I don't think he was very well liked.

Id. at 33:13-22. However, Young also testified that he did not know what Walker thought about Whalon. Id. at 33:23-25.

Randy Kania, Director of Operations at Express.Net, states in an affidavit that at the time Whalon failed the proficiency training, he was not aware that Whalon was the FAA hotline caller. Kania Affidavit ¶ 8. Walker states in his affidavit that "[t]o the best of my knowledge, I was unaware that Mr. Whalon had contacted the FAA at the time he failed the simulator training." Walker Affidavit ¶ 7.

Whalon asserts that before late September 2004, he received many charter flights, usually international flights, from Express.Net. Whalon Affidavit ¶ 10. These flights increased his monthly income because they were typically far longer flights than domestic assignments. Id. Whalon states that after September 2004, he stopped receiving these assignments, and that the scheduling department at Express.Net informed him that "as a result of instructions they had received from Joe Huertas, I

would not be assigned any Charters or Ferry Flights or Bahrain Flights, even if these flights were available." Id.

Express.Net disputes Whalon's assertion that he was refused charter flights. Kania states in his affidavit that from September 2004 to Whalon's February 2005 resignation, there were no changes in Whalon's flight schedule or hours, or other terms or conditions of employment, other than the loss of his Check Airman status and associated loss of Check Airman pay in December 2004. Kania Affidavit ¶ 9. Whalon acknowledged in his deposition that the last time he flew a Bahrain flight was at the end of 2003, and that he did not remember going to Bahrain during 2004. Alpern Affidavit, Exhibit 2 (Whalon dep.) 368:1-5.

Whalon resigned his position at Express.Net on February 28, 2005. In August 2005, Whalon called Young to discuss the possibility of returning to work at Express.Net. Id. at 327:13-16, 329:25-330:2.

### Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine dispute arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

State of California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324. Assuming that there has been sufficient time for discovery, summary judgment should be entered against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor. Clicks Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir. 2001).

## Discussion

Whalon's first claim is for violation of Or. Rev. Stat. §§ 659A.030(f) and (g). For this claim, Whalon alleges that Express.Net retaliated against him "because he complained of matters of public concern, including but not limited to misuse of power, resources and authority by a supervisory level employee of

defendant," and that Express.Net "aided and abetted the unlawful conduct" alleged in the complaint in violation of § 659A.030(1)(g) "through its failure to promptly investigate and correct the matters of public concern/safety and through its retaliation" against Whalon for "complaining of matters of public concern/safety in the workplace." Amended Complaint, ¶¶ 29, 30.

The second claim is for wrongful termination in violation of the Oregon Whistleblower Protection statute, Or. Rev. Stat. § 659A.230. For this claim, Whalon alleges that Express.Net "retaliated against Whalon and terminated Whalon's employment as captain and check airman because he disclosed information he reasonably believed evidenced mismanagement, waste, and/or substantial danger to public health and safety." Id. at ¶ 35.

The third claim is for common law wrongful discharge. For this claim, Whalon asserts that during his employment, he pursued private legal rights related "directly to his role as an employee which are of important public interest," Id. at ¶ 45, and that Express.Net constructively discharged Whalon because of the exercise of such rights.[1] Id. at ¶¶ 41, 42.

1.  First Claim for Relief under Or. Rev. Stat. §§ 659A.030(1)(f), (g)

Whalon concedes that his first claim for relief should be dismissed.

---

[1] A fourth claim for relief, intentional infliction of emotional distress, has been dismissed.

2.  <u>Second Claim for Relief under Or. Rev. Stat. §
    659A.230</u>

This statute provides, in relevant part:

It is an unlawful employment practice for an employer
to discharge, demote, suspend or in any manner
discriminate or retaliate against an employee with
regard to promotion, compensation or other terms,
conditions or privileges of employment for the reason
that the employee has in good faith reported criminal
activity by any person, has in good faith caused a
complainant's information or complaint to be filed
against any person, has in good faith cooperated with
any law enforcement agency conducting a criminal
investigation, has in good faith brought a civil
proceeding against an employer or has testified in
good faith at a civil proceeding or criminal trial.

To establish a prima facie case of unlawful retaliation
under Or. Rev. Stat. § 659A.230, Whalon must prove 1) he engaged
in protected activity; 2) he suffered discrimination or
retaliation in the terms or conditions of his employment; and 3)
a causal connection exists between the two. <u>Carlton v. Marion
County</u>, 2005 WL 1113836 at *4(D. Or. 2005); <u>Lakeside-Scott v.
Multnomah County</u>, 2004 WL 1068796 at *29 (D. Or. 2004).

Express.Net contends that Whalon cannot establish a causal
connection between the allegedly curtailed flights to Bahrain and
his complaints to the FAA because Whalon admitted he could not
recall the last time, before September 2004, that he had flown to
Bahrain and did not recall flying there for at least nine months
before he contacted the FAA in September 2004. Thus, Express.Net
argues, Whalon's claim that he was not scheduled to fly to

Bahrain during the five month period between his contact with the FAA and his resignation reflected "business as usual," not retaliation. Express.Net contends that the causal connection is further weakened by Whalon's testimony that he did not know whether the scheduler was aware that Whalon was the FAA hotline caller.

Express.Net asserts that Whalon's payroll records contradict Whalon's statement in his affidavit the before late September 2004, he received many international flights that substantially increased his monthly income. The payroll records show that Whalon's earnings and hours were higher after Whalon's hotline call than before the call. See Kania Supplemental Affidavit ¶ 6, Exhibit B. Those records also show that Whalon's earnings and hours for the last three bid periods in 2004 were greater than his hours and earnings for the last three bid periods of 2003. Id. at ¶ 7; Exhibits B, C. And finally, Kania states that he has reviewed Whalon's flight schedule and learned that he made only one trip to Bahrain, in early 2003. Id. at ¶ 8.

Express.Net argues that the records establish that neither Whalon's hours, nor his earnings were curtailed after the FAA call. I agree that Whalon has failed to create an inference that his international flights were curtailed, or that his hours and earnings decreased, after the call to the FAA, an issue on which Whalon would have the burden of proof at trial.

14  - OPINION AND ORDER

Express.Net contends that the undisputed facts show Whalon's Check Airman status was revoked because he failed his proficiency training. Express.Net argues that the proficiency training was routinely conducted in October or November, see Whalon dep. 106:2-14, so there was nothing unusual in Whalon's training being conducted on October 25, 2004. Express.Net also relies on Walker's testimony that Whalon failed the proficiency training, Whalon's testimony at his deposition that he had no basis for believing Walker would falsify his test, and Whalon's acknowledgment that Walker was not among those Whalon suspected of figuring out that Whalon was the hotline caller. Express.Net relies further on Young's testimony that although Huertas and Kania participated in the decision to revoke Whalon's Check Airman status, Young did not know whether Huertas or Kania participated in that decision because of Whalon's FAA contact. Young dep. 30:9-19.

Express.Net argues Whalon has no evidence connecting his failed flight training with the FAA complaint, and that the evidence in the record does not support such an inference.

Express.Net asserts that Whalon's testimony suggesting hostility toward him, such as Whalon's testimony that Walker said he had been told by Huertas that Huertas had just come out of a management meeting about Whalon, Walker's statements to Whalon that he would not want to be in Whalon's shoes and that what

Whalon did "pissed everyone off," and Casey's remark that Whalon he was going to get everyone fired, does not establish causation because none of this evidence directly relates to the FAA hotline call.

I disagree with this contention. There is other evidence in the record from which an inference could be drawn that Express.Net was motivated to retaliate against Whalon for the FAA hotline call. This evidence includes the complaint in Young's action against Express.Net, alleging that Express.Net was violating FAA safety regulations and instructing its management people to collude in those violations and keep quiet about them; Young's testimony that he was told by Clark to fire the person who called the hotline (although Young also testified that neither he nor Express.Net actually took steps to fire Whalon, and Whalon was not fired); Young's testimony that he and others at Express.Net knew it was Whalon who had called the FAA; Young's testimony that trainers could pass "marginal" pilots who failed their tests if the pilots were liked; and the evidence that Whalon initially failed the proficiency training, but passed it the next day and nevertheless had his Check Airman status revoked.

Express.Net points out that Whalon himself claimed at his deposition that Huertas revoked his Check Airman status not because of the FAA hotline call, but because Whalon believed that

16  - OPINION AND ORDER

Huertas did not like him. See Whalon dep. p. 148-49, *passim*. Whalon testified that he and Huertas had difficulties back in 2003, Whalon dep. p. 148-151 *passim.* Express.Net contends that because Huertas's dislike of Whalon predated the September 26, 2004 FAA complaint, it could not support Whalon's claim that his status was revoked because of the complaint. But evidence that Huertas disliked Whalon before he made the FAA hotline call does not necessarily exclude the possibility that Huertas's revocation of Whalon's Check Airman status also had a retaliatory motive.

When all this evidence is considered together, I conclude that Whalon has made out a prima facie case of retaliation.

Express.Net argues that even if Whalon can establish a prima facie case of retaliation, his claim must fail because he cannot show a constructive discharge. This argument is unpersuasive. Section 659A.230 is not limited to termination. The statute states that employers cannot "discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment." Under this provision, the revocation of Whalon's Check Airman status could constitute retaliation "with regard to ... compensation or other terms, conditions or privileges of employment."

Express.Net's motion for summary judgment on Whalon's claim under Or. Rev. Stat. § 659A.230 is denied.

3.   <u>Third Claim for Relief - Constructive Discharge</u>

Express.Net moves against Whalon's common law constructive discharge claim on the ground that he cannot show that working conditions at Express.Net were so intolerable that a reasonable person would have resigned because of them.

The elements of wrongful discharge are 1) that the employer intentionally created or maintained specific working conditions; 2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; 3) the employer wanted to cause the employee to leave his employment or was substantially certain that he would leave his employment as a result of those working conditions; and 4) the employee did leave employment as a result of those working conditions. <u>McGanty v. Staudenraus</u>, 321 Or. 532, 557 (1995)(en banc).

Express.Net argues that the primary impediment to Whalon's constructive discharge claim is his decision, six months after he left his employment at Express.Net, to inquire about re-employment at Express.Net, and Whalon's admission at his deposition that at the time he inquired about re-employment, nothing at Express.Net had changed. I do not entirely agree with Express.Net's interpretation of Whalon's deposition testimony. The testimony cited by Express.Net shows the following question and answer:

    Q:    What, if anything, had changed between when you
          quit in February of '05 and August of '05 when
          you    called    to    inquire    about    possible
          reemployment?
    A:    I'm not sure what I was looking for.
    Q:    What, if anything, had changed?
    A:    I'm not sure.

Whalon  dep.  330:19-25.  Express.Net  also  points  to  Whalon's

deposition  responses  when  asked  why  he  quit  his  job,  asserting

that  Whalon  said  it  was  because  Huertas  did  not  like  him.

    Q:    Why did you quit your job at Express.Net?
    A:    I was forced to.
    Q:    Did somebody say you're fired?
    A:    I could not physically and mentally do my job under
          the duress and continue the job under Joe Huertas.
    Q:    What was Joe Huertas doing that was making you unable
          to do your job?
    A:    I don't have the exact dates. Joe Huertas confronted
          me in Aeroservices. I was going for check airman
          training. Now, I had already been a check airman on
          the Boeing 727. I was told by Captain Kittredge that
          once I had the required hours and that the company and
          I felt comfortable, that they would move me into the
          position as a check airman with the Airbus 300. I was
          going for training with Richard Arguez who was going
          to be my instructor.
    Q:    This is back in '03?
    A:    I believe that's-- Maybe earlier. I'm trying to figure
          out the exact time.
                              * * *
          Anyway, Joe Huertas confronted me, and evidently he
          was part of the training. ... he confronted me as
          though he was in management in Aeroservices, raised
          his voice very loud at me, and took issue with me on
          a gentleman by the name of Jim Williams. He said he
          had heard through the grapevine that I had disagreed
          that Jim Williams would be furloughed first even
          though he was one of the most senior pilots. ... I
          forget the exact conversation, but he said that I had
          said certain things, and I had said--I said Joe, let's
          go into another room if you want to talk about this,
          but please do not raise your voice. The receptionist
          at the desk is looking at us, the people who are

sitting down in the chairs close to us and on the
other side of the lobby are looking at us, and if you
want to discuss this matter, let's do it in a civil
manner. ... So from that point, for some reason, he
did  not like me. ...

Q:  So you had an issue with Huertas in '03 where he
didn't want you to become a check airman. Despite that
you became a check airman. What else led to your
decision to quit in February of '05?

A:  Oh, boy. My mind is kind of shot right now, there's a
lot of things. I know you want this answered right
now. It's 2:30. Would you guys mind taking a break
before we answer that?

Q:  Well, there's a question pending and so typically when
there's a question pending we like to complete that.
I'm happy to give you a break right after you answer
the question, which is, what were the reasons that led
you to quit in February of '05.

A:  Yeah. I would love to give you all the answers. My
mind won't allow me to do that right now, but I will
attempt to do that because there's a question.

Q:  Take as much time as you need, look out the window--

A:  Yeah.

Q:  --gather your thoughts.

A:  I would say number two is that two close people in my
life was [sic] Randy Kania and also Tom Kittredge. I
had tried to talk to Randy, and Randy would not talk
to me. Tom Kittredge would not talk to me. And then
there was a point where the company was not allowing
me to fly flights. The scheduler, Alicia, told me that
Joe Huertas said that I was not allowed to fly the
flights. My check airman was being taken away.
Obviously, if you look at this simulator thing, just
like this thing that was made up here, you know, there
was pressure from the company to force me to quit. And
based on other people who were forced to quit, and
being called by Jim Young, I was demanded to come down
and see Jim Young and sit before him and answer for
those things. Now maintenance was very, very upset at
me because of the fact that I had-could not fly an
airplane that was unsafe. I had felt it at that time
that   maintenance   at   Express.Net   was-needed
improvement, and that with the present people there,
they were pencil whipping things and it was out of
control and I could no longer fight. I was totally
worn out and duressed because I was tired of fighting
the hub maintenance in Dayton because of their pencil

> whipping. I had written Joe Huertas many times, with
> letters to Randy Kania and conversations with both of
> them, about malfunctioning parts that were never
> fixed, and I thought that they needed to be resolved
> in order for me to have the respect, which has to do
> with safety with crew members that you're flying with
> because of resource management. You must be able to
> fly safe airplanes. And I believed at that time,
> because of the fact that Express.Net–the chronologic
> order of what happened after I could not fly the
> airplane, and then I also was duressed at that time.
> Q:   If you had to say what the main reason was or the top
>      two or three reasons, what would those be?
> A:   Maintenance, maintenance, maintenance.
> Q:   Meaning what?
> A:   Meaning pencil whipping ... [deposition extract ends]

Whalon dep. 148:25-153:25.

I agree with Express.Net that Whalon's testimony fails to
establish that Express.Net intentionally created or maintained
specific working conditions that were so intolerable a reasonable
person would have resigned because of them, or that Express.Net
wanted to cause Whalon to leave or was substantially certain that
he would leave as a result of those conditions. Whalon's
testimony shows that the confrontation with Huertas occurred more
than a year before Whalon resigned, and was over Whalon's Check
Airman status, which Whalon was given. Although Whalon says he
complained to management, including Young, Kittridge and Huertas,
about pencil whipping for the three year period before he quit,
Whalon dep. 251:15-19, Whalon could not identify a single
incident in which maintenance records were pencil whipped. Whalon
dep. 253:16-25; 254:19-22.

Express.Net argues that the other incidents alleged by Whalon are minor and isolated instances not sufficient to create intolerable working conditions. Express.Net cites <u>King v. AC & R Advertising</u>, 65 F.3d 764, 768-69 (9th Cir. 1995)("a poor performance rating or demotion, even when accompanied by a reduction in pay, does not by itself trigger a constructive discharge.") Further, Express.Net argues, Whalon's testimony indicates that the events he describes persisted over a period of several years, vitiating his argument that they were so intolerable that they caused him to leave his employment.

Whalon responds that the "drastic reduction" in Whalon's overseas flight assignments and the "seemingly contrived" Check Airman test provide sufficient factual support to create a material issue of fact as to whether Whalon was constructively discharged. I disagree. The evidence before the court does not substantiate Whalon's assertion that his overseas flight assignments were drastically reduced, or that his income from overseas flights was drastically reduced. While I have concluded that a reasonable jury could find that the revocation of Whalon's check airman status was causally linked to his FAA hotline call, I am unpersuaded that this single incident is enough to support a constructive discharge claim.

Express.Net is entitled to summary judgment on this claim.

Express.Net's motion for summary judgment is GRANTED with

respect to the first and third claims for relief, and DENIED with respect to the second claim for relief.

IT IS SO ORDERED.

Dated this 20th day of July, 2007.


                                    /s/  Dennis James Hubel
_____

                              Dennis James Hubel
                              United States Magistrate Judge